**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-2109**

TECNOCAP, LLC,

       Petitioner,

   v.

NATIONAL LABOR RELATIONS BOARD,

       Respondent,

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,

       Intervenor.

**No. 19-2191**

NATIONAL LABOR RELATIONS BOARD,

       Petitioner,

   v.

TECNOCAP, LLC,

       Respondent,

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,

Intervenor.

---

On Petition for Review of an Order of the National Labor Relations Board. (1:06-CA-216499)

---

Submitted: December 11, 2020                    Decided: June 17, 2021

---

Before WILKINSON, AGEE and RICHARDSON, Circuit Judges.

---

Petition for review granted in part and denied in part, cross-application for enforcement granted in part and denied in part, and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Wilkinson and Judge Richardson joined.

---

Bradley K. Shafer, MINTZER SAROWITZ ZERIS LEDVA & MEYERS, Wheeling, West Virginia, for Petitioner/Cross-Respondent. Peter B. Robb, General Counsel, Alice B. Stock, Deputy General Counsel, Meredith Jason, Acting Deputy Associate General Counsel, David Habenstreit, Assistant General Counsel, Julie Brock Broido, Supervisory Attorney, Milakshmi V. Rajapakse, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. Maneesh Sharma, Associate General Counsel, Washington, D.C., for Intervenor.

---

AGEE, Circuit Judge:

Tecnocap, LLC, petitioned for review of an order of the National Labor Relations Board ("the NLRB" or "the Board") affirming the decision of an administrative law judge ("ALJ") finding that Tecnocap engaged in several unfair labor practices, in violation of the National Labor Relations Act ("NLRA" or "the Act"). The Board cross-applied for enforcement of the order. For the reasons set forth below, we grant Tecnocap's petition for review in part and deny it in part, grant the Board's cross-petition for enforcement in part and deny it in part, and remand this case to the NLRB for entry of a remedial order consistent with this opinion.

I.

Tecnocap is a West Virginia employer in the business of manufacturing metal bottle and jar lids for non-retail sale. During the relevant period, Tecnocap employed individuals belonging to two unions who were subject to two different collective bargaining agreements ("CBAs") with two separate end dates. The main events at issue in this case relate to Tecnocap's negotiation of a new CBA with one of the unions: the Glass, Molders, Pottery, Plastics & Allied Workers International Union AFL-CIO, CLC and Local Union No. 152 ("the GMP").[1] The GMP bargained on behalf of "all hourly production and maintenance employees, including warehousemen, except employees on jobs covered by

---

[1] The GMP subsequently merged with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, AFL-CIO, CLC. The merger does not materially impact the underlying events or parties' responsibilities, so for ease of reference, the opinion will refer simply to "the GMP."

other contracts with other unions, salaried supervisors, office clerical and other employees excluded by law." J.A. 120. Other Tecnocap employees are represented by the International Association of Machinists and Aerospace Workers ("the IAM"). The IAM bargained on behalf of "all Tool & Die Makers, Machinists, Electricians, Die Setters, Millwrights, and their Apprentices." J.A. 181.

In the months leading up to the expiration of the two unions' existing CBAs, Tecnocap informed both unions that upcoming negotiations would need to address how to keep the production line running during lunch breaks because it was losing approximately $50,000 per shift as a result of the current work structure. Efforts to rectify this issue had, to date, proven unsatisfactory because the GMP and IAM did not agree to an arrangement that would allow employees of the IAM's bargaining unit to temporarily cover GMP bargaining unit positions. Tecnocap made clear its desire to minimize pauses in the production line going forward, and it proposed to convert the GMP's then-existing fourteen job classes into three classifications: Operator I, Operator II, and Operator III. In addition, Tecnocap sought to move die setters from the IAM's bargaining unit to the GMP's, and then make the die setter position the entire Operator III class. In furtherance of that goal, Tecnocap sought to negotiate with the IAM first even though its CBA expired after the GMP's. But the IAM declined to negotiate early, so Tecnocap and the GMP began negotiations.

The existing CBA between Tecnocap and the GMP was set to expire in November 2017, but just before that date, the parties extended the term several months to February 28, 2018. The signed Memorandum of Agreement extending the CBA listed several

4

conditions for doing so, including: (1) the GMP "accepts the three job classes of Operator I, Operator II, and Operator III," and (2) "[n]egotiations [are] to continue as to red-circling, grandfathering, and who falls into what class." J.A. 178.[2]

Over the next several months, the parties' representatives met over a dozen times to negotiate a new CBA. Throughout, Tecnocap sought to restructure the GMP's existing fourteen classes into the three Operator classes and proffered that the Operator III class would be reserved for the die setters who would be transferred from the IAM to the GMP bargaining unit. For its part, the GMP countered with a proposal distributing its current bargaining unit of fourteen positions among all three Operator classes. For example, on

---

[2] The negotiations over the new CBAs aligned with a transition period in West Virginia labor law and, relatedly, to a transition in the terms of employment for positions covered by the CBAs. "In 2016, the West Virginia Legislature enacted the Workplace Freedom Act . . . , making West Virginia the nation's twenty-sixth right-to-work state." *Morrisey v. W. Va. AFL-CIO*, 842 S.E.2d 455, 459 (W. Va. 2020); *see* W. Va. Code § 21-5G-1 to -7. "The Act vests workers with the right to choose for themselves whether they will become a member of a labor organization, rather than having that choice imposed upon them by virtue of an agreement between their employer and a labor organization[.]" *Morrisey*, 842 S.E.2d at 464. The same bill adopting these provisions amended West Virginia statutes to "no longer allow[] workers to be required, as a condition of their employment, to associate with, or pay dues to, a labor organization" and to "eliminate[] the authorization of 'union security agreements' in West Virginia." *Id.* at 459 (citing W. Va. Code §§ 21-1A-3 and 21-1A-4(a)(3)). The Act became effective on May 4, 2016 and applied prospectively to "any written or oral contract or agreement entered into, modified, renewed or extended on or after July 1, 2016." *Id.* at 464–65; *see* W. Va. Code § 21-5G-7. The Act's constitutionality was immediately challenged, but in 2020 the Supreme Court of Appeals of West Virginia held that it was constitutional. *Id.* at 460.
    All this to say that the expired CBA with the GMP—which came into effect before passage of the Workplace Freedom Act—required all employees working in positions covered by the CBA to be a member of the GMP, as was then permitted under West Virginia law. Although the Workplace Freedom Act grandfathered in that provision for the duration of the CBA, extensions and new agreements entered into after July 1, 2016 could no longer require union membership as a condition of holding a particular job.

February 12, 2018, the GMP submitted a proposal that included, among other things, placing four current GMP positions into the Operator III classification. Three days later, Tecnocap countered with its "last and final" offer, J.A. 22, which reclassified only one IAM-represented die setter into the Operator III classification. The GMP rejected that offer, but expressed its willingness to continue negotiations.

Another in-person meeting was scheduled for February 26, but on the evening of the 25th, Tecnocap cancelled the meeting and indicated that it was prepared to declare an impasse. This announcement led to a flurry of correspondence with representatives of each party disputing the other's characterization of where negotiations stood. Tecnocap identified three areas of principal disagreement. Particularly relevant here, it "reminded" the GMP "that the three job classifications ha[d] been the main point on which extension was granted in November. Unfortunately, yes, more than three months ago and [it] d[id]n't really know how to interpret [the GMP's] recent genuine objections on those." J.A. 274. On February 28—the last day of the existing CBA's extended term—the GMP replied:

> The third job classification which [Tecnocap] is insisting upon in bargaining consists exclusively of work that is not in the GMP Council/USW bargaining unit and does not belong to the GMP Council/USW. All of the work in this "third job classification" belongs to the IAM. The GMP/USW has repeatedly advised [Tecnocap] that there is no basis for the parties to bargain over this third job classification which does not belong to the GMP Council/USW. This is an improper subject for bargaining. To the extent that [Tecnocap] considers this a permissible subject of bargaining you are advised that the GMP Council/USW does not wish to bargain on this issue. You appear to believe that [you] can bargain to impasse over this issue. You are incorrect.

J.A. 275.

6

On March 1, Tecnocap posted a notice on its employee bulletin board informing employees that it and the GMP were at an impasse and that Tecnocap was going to implement its last and final offer, effective immediately.

Four days later, Tecnocap posted another bulletin board notice stating that due to the impasse, all GMP members would be locked out beginning March 13 until an agreement was reached. The notice indicated that employees should direct any questions to its human resources department.

In response to inquiries from some employees, Tecnocap posted follow-up notices. The March 7 posted notice explained that:

- "[t]he Lockout applies only to GMP union members";

- Tecnocap "may, or may not, hire employees to work during the lockout" as "temporary employees" hired at-will;

- GMP members would be permitted to return to work at the end of the lockout and that if a temporary employee "needs to be let go to make room for a returning GMP member, then that 'temporary employee' will lose his or her job";

- temporary employees "may work the entire duration of the lockout, however long that may be—days, weeks, months, years, etc.";

- it would be "an unfair labor practice for the company to make any promises of employment to anyone in advance of a lockout that might be affected by that lockout" or "for the union to coerce people to remain union members against their will"; and

- employees' decisions were "matters of your own personal interest and the company cannot tell or advise you as to what you should or should not do."

J.A. 282. A few days later, Tecnocap posted a final notice reiterating that the lockout "applie[d] only to GMP union members. Members of the IAM, salaried personnel, and

7

others are expected to continue to work" and advising that Tecnocap "will be hiring temporary employees during the lockout. If you wish to apply for a position, please see Darrick Doty," who was Tecnocap's human resources director. J.A. 286.

At the time the last written notice was posted, three GMP members had already resigned from the union and three more members resigned within a day of its posting. Tecnocap hired all six of the former GMP member-employees as temporary employees. They signed documents stating they understood that their employment may be terminated when the lockout ended. Although the letters indicated they were to bring the requisite identification documents to complete new I-9 forms for tax purposes, none of them submitted those new forms. The six former GMP members performed the same work during the lockout that they had previously performed.

The lockout lasted from March 13 to March 21, and ended when Tecnocap and the GMP agreed to the terms of a new CBA. The terms of the new CBA are not at issue on appeal.[3] At the end of the lockout, the six former GMP members were terminated as at-will employees, but immediately rehired to work under the terms of the new CBA.

Once the new CBA was in effect, the GMP filed a charge of unfair labor practices with the NLRB. Although the parties stipulated to the facts, they sharply contested their

---

[3] Consistent with the Workplace Freedom Act, the new CBA no longer required union membership as a precondition of employment for any of the covered positions so long as West Virginia remained a right-to-work state. J.A. 341 ("Employees shall not be compelled to become or remain members of the union as a condition of continuing employment. . . . Should West Virginia cease to be a right-to-work state, it is agreed that this language shall become null and void and be replaced by the language appearing in the [CBA] with the effective date of November 29, 2015[.]").

meaning and legal significance. At trial, the ALJ heard from both union and Tecnocap representatives, as well as from two of the former GMP members who had resigned and been rehired to work during the lockout. Both employees stated that they had resigned due to their frustration with the GMP and their desire to continue working.

The ALJ determined—and the NLRB subsequently adopted the finding—that Tecnocap had engaged in five unfair labor practices that required related relief. Specifically, the ALJ and NLRB concluded that Tecnocap violated the NLRA by:

1. "[P]artially implementing its last, best and final offer by establishing new job classifications without reaching good faith impasse," in violation of sections 8(a)(1) and (5);

2. "[L]ocking out Union members in support of a demand that the Union agree to a contract provision to change the scope of the bargaining unit, a permissive subject of bargaining," in violation of sections 8(a)(1) and (5);

3. "[B]ypassing the Union and dealing directly with unit employees by soliciting employees to enter into individual employment contracts offering employees employment during a partial lockout on the condition that they abandon their membership in the Union," in violation of sections 8(a)(1) and (5);

4. "[D]iscouraging membership in the [GMP] by telling employees that [it would] only lockout union members and implicitly solicit[ing] their resignations from the Union," in violation of section 8(a)(1); and

5. "[D]iscouraging membership in the [GMP] by locking out unit employees who are members of the Union while permitting unit employees who are not members of the Union to continue working," in violation of sections 8(a)(1) and (3).

9

J.A. 792; 804.[4] In short, the first two unfair practices stemmed from findings related to Tecnocap's decisions before commencing the lockout, while the last three violations arose out of Tecnocap's communications and actions before and during the lockout.

Tecnocap filed a petition for review of the NLRB's order, and the Board applied to have the Court enforce its order. Jurisdiction is proper in this Court because Tecnocap's conduct occurred in West Virginia. *See Ford Motor Corp. v. NLRB*, 305 U.S. 364, 369 & n.2 (1939).[5]

## II.

## A.

The Court's review of an NLRB order is limited, as we must "uphold the NLRB's findings of facts if they are supported by substantial evidence," considering the record as a whole. *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 838 (4th Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Air Contact Transp. Inc.*, 403 F.3d 206, 210 (4th Cir. 2005).[6] The Board is permitted to "draw reasonable inferences from the evidence," though it "may not base its inference on pure speculation." *Owens-Corning Fiberglas Corp. v.*

---

[4] The NLRB declined to adopt two of the ALJ's findings that did not alter the remedy ordered and modified one conclusion of law related to the amended findings of fact. None of these actions are challenged or at issue on appeal.

[5] The GMP successfully moved to intervene, advocating enforcement of the NLRB order.

[6] We have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

*NLRB*, 407 F.2d 1357, 1362 (4th Cir. 1969). If substantial evidence exists, "we must uphold the Board's decision even though we might have reached a different result had we heard the evidence in the first instance." *Air Contact Transp.*, 403 F.3d at 210.

Further, "[i]f the Board's legal interpretations are rational and consistent with the Act," then the Court will uphold them. *Media Gen. Operations, Inc. v. NLRB*, 394 F.3d 207, 211 (4th Cir. 2005). We defer to its reasonable interpretations of the NLRA "even if the NLRB's reading of the Act is not the best way to read the statute." *NLRB v. Pepsi Cola Bottling Co. of Fayettville, Inc.*, 258 F.3d 305, 310 (4th Cir. 2001).

Consistent with these standards, we also defer to the Board on mixed questions of fact and law, upholding "application of legitimate legal interpretation to the facts of a particular case [when] they are supported by substantial evidence based upon the record as a whole." *Id.*

B.

The NLRA "is designed to encourage individual employees to join labor unions and bargain collectively, while at the same time ensuring that a company can control the functioning of its business." *Dorsey Trailers*, 233 F.3d at 838. Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively," as well as to "refrain from any or all of such activities." 29 U.S.C. § 157. Section 8 proscribes various unfair labor practices committed by employers, and three of its subsections are at issue in this case, (a)(1), (3), and (5). § 158(a).

11

Section 8(a)(1) broadly prohibits employers from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of" their section 7 rights. *Id.* Given the breadth of its language, section 8(a)(1) violations often accompany a violation of one or more of the other, more precise, practices prohibited in the other subsections. *See, e.g.*, *Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 163 n.6 (1971); *see, e.g.*, *Int'l Bhd. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers, AFL-CIO, Local 88 v. NLRB*, 858 F.2d 756, 761 (D.C. 1988) ("'[I]t has been universally recognized that any violation of [section 8(a)(3)] must also, automatically, constitute a violation of Section 8(a)(1).'" (second alternation in original) (quoting Thomas G.S. Christensen & Andrea H. Svanoe, *Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality*, 77 Yale L.J. 1269, 1324 (1968)).

With certain exceptions not at issue here, section 8(a)(3) prohibits employers from "discrimination" on the basis of union membership as part of any hiring decision or term or condition of employment. 29 U.S.C. § 158(a)(3). "By its terms, the statute requires proof that disparate treatment has been accorded union members and that the employer's action is likely to discourage participation in union activities." *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 700 (1983). But because "Congress . . . did not intend to make unlawful all acts that might have the effect of discouraging union membership," the Supreme Court has recognized that proof of antiunion motivation will ordinarily be required as well. *Id.*; *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33 (1967) ("The statutory language 'discrimination *to* discourage' means that the finding of a violation normally turns on

12

whether the discriminatory conduct was motivated by an antiunion purpose.").[7] Thus, while "[s]ome conduct . . . is so inherently destructive of employee interests that it may be deemed proscribed without need for proof of an underlying improper motive," when the conduct's "harm to employee rights is comparatively slight" and the employer shows "a substantial and legitimate business end" for its conduct, then it is "prima facie lawful, and an affirmative showing of improper motivation must be shown" to establish a violation. *Great Dane Trailers*, 388 U.S. at 33, 34.

Section 8(a)(5) builds on section 8(a)(1)'s broader unfair-labor practice language by specifically prohibiting employers from "refus[ing] to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). This prohibition is caveated by various cross-referenced provisions, including 29 U.S.C. § 158(d), which requires employer and employee representatives to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." Thus, the statute sets out limited "mandatory" subjects of collective bargaining, and parties are "free to bargain *or not to bargain*, and to agree *or not to agree*" about any additional, "permissive" subjects. *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958) (emphases added). In short, an employee's *duty* to bargain collectively under section 8(a)(5) is "limited to those subjects" set out in § 158(d). *Id.*; *see NLRB v. Greensburg Coca-Cola Bottling Co.*, 40 F.3d 669, 673 (3d Cir. 1994) ("[A] party violates

---

[7] Violations of section 8(a)(1), in contrast, do not require proof of unlawful motive. *NLRB v. Brown*, 380 U.S. 278, 286 (1965); *Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733, 747 (4th Cir. 1998) ("Unlike violations of § 8(a)(3), an employer's antiunion motivation is not a required element of § 8(a)(1).").

13

section 8(a)(5) of the [NLRA] by insisting, even in good faith, on a non-mandatory subject as a precondition to reaching agreement on mandatory subjects.").

## III.

We begin with the Board's conclusion that Tecnocap violated sections 8(a)(1) and (5) by declaring an impasse over a permissive—rather than mandatory—subject of collective bargaining, partially implementing its last and final offer, and instituting a lockout based on that impasse.

### A.

#### 1.

Recognizing that the duty to bargain collectively as to mandatory subjects will not always result in an agreement between the parties, the NLRA allows the parties to proceed to an impasse under certain circumstances. A good faith impasse "exists when the collective bargaining process has been exhausted and, despite the parties' best efforts to reach an agreement, neither party is willing to move from its position." *Grinnell Fire Prot. Sys. Co. v. NLRB*, 236 F.3d 187, 196 (4th Cir. 2000). Once a lawful impasse has been declared "an employer [can] unilaterally institut[e] changes regarding wages, hours, and other terms and conditions of employment." *Id.* As we have made clear, however, "rooted in the definition of 'collective bargaining' in section 8(d) of the NLRA" is the principle that employers may only declare an impasse and unilaterally institute changes to employment as to mandatory—not permissive—subjects of collective bargaining. *AMF Bowling Co. v. NLRB*, 977 F.2d 141, 148 (4th Cir. 1992).

14

One subject we've long recognized as a permissive subject of bargaining is a change in the scope of the bargaining unit. *Newport News Shipbuilding & Dry Dock Co. v. NLRB*, 602 F.2d 73, 76 (4th Cir. 1979) ("It is well settled that insistence on a change in the scope of the unit certified by the Board violates [section] 8(a)(5) [.] . . . The description of the bargaining unit is not a mandatory subject of bargaining."); *see AMF Bowling Co.*, 977 F.2d at 148 ("A proposal [to 'alter[] the description of the bargaining unit'] is a permissive subject of bargaining.").

2.

Tecnocap does not take issue with this legal framework, but instead argues that substantial evidence does not support the NLRB's determination that Tecnocap declared the impasse to force the GMP to bargain over a permissive subject of collective bargaining, i.e., over the scope of the collective bargaining unit. It contends that this subject was not part of the negotiations about a new CBA at all because that matter had been resolved by the parties' Memorandum of Agreement extending the prior CBA to February 28, 2018. According to Tecnocap, that agreement expressed the GMP's permanent acceptance of not just the three Operator classifications, but also Tecnocap's proposal that the Operator III classification would be filled solely by the then-IAM-represented position of die setter. For this reason, Tecnocap asserts that the impasse was not—and could not have been—declared based on a disagreement about the scope of the bargaining unit. Consequently, Tecnocap argues that this issue was not the basis for the impasse, so it did not declare an impasse based on a permissive rather than mandatory subject. And, lastly, it maintains that because this initial factual finding as to the basis for declaring the impasse formed the basis of the

15

other related unfair labor practices (partially implementing the last and final offer and instituting the lockdown), those conclusions were erroneous.

We disagree with Tecnocap for two reasons. First, the plain language of the Memorandum of Agreement belies Tecnocap's interpretation of it. Second, the parties' subsequent negotiations confirm that the scope of the bargaining unit was a main point of disagreement leading Tecnocap to declare the impasse. For these reasons, substantial evidence supports the NLRB's determination that Tecnocap unlawfully declared an impasse based on the GMP's refusal to negotiate as to the scope of the bargaining unit, a permissive rather than mandatory subject of collective bargaining.

First, the Memorandum of Agreement did not permanently resolve who fell into which of the three job classifications. It plainly states that the GMP "accepts the three job classes of Operator I, Operator II, and Operator III," but that "[n]egotiations [are] to continue as to red-circling, grandfathering, *and who falls in what class*." J.A. 178 (emphasis added). As the ALJ observed, the Memorandum of Agreement "made no mention of the die setter position or the job descriptions proposed by [Tecnocap]." J.A. 622, 796. Put simply, the GMP's willingness to accept the shift from fourteen positions to three does not conclusively demonstrate its willingness to accept that the Operator III classification would be filled by the then-IAM-represented position of die setter, as Tecnocap proposed previously. Given that the Memorandum of Agreement declares that negotiations about "who falls in what class" would "continue" as part of the negotiation of the new CBA, J.A. 178, the plain text contradicts Tecnocap's argument.

16

Second, the parties subsequently negotiated about which positions fell into each of the three Operator classifications, with the inclusion of die setters within the GMP's bargaining unit continuing to be a point of contention that ultimately led Tecnocap to declare the impasse. The record reflects that during negotiations over the new CBA, both entities' proposed alternative understandings of which positions would fall within each Operator class, including whether and how the IAM-represented die setters would be classified and brought within the GMP bargaining unit. As the negotiations faltered just before declaration of the impasse, both the GMP and Tecnocap identified the makeup of the three job classifications as an ongoing basis of disagreement. The GMP noted that die setters were "not in the GMP . . . bargaining unit and d[id] not belong to the GMP," and reiterated to Tecnocap that it did "not wish to bargain on this issue." J.A. 275. Most illuminating, Tecnocap identified the parties' inability to "reach an agreement" as to the three job classifications as one of the three "main points" that had led it to declare the impasse. J.A. 274.

These record facts constitute substantial evidence supporting the NLRB's determination that Tecnocap engaged in unlawful labor practices arising from the declaration of the impasse. Put another way, the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Smithfield Packing Co. v. NLRB*, 510 F.3d 507, 516 (4th Cir. 2007). From this factual foundation as to the declaration of an impasse based on a disagreement as to the scope of the bargaining unit, each of the related legal conclusions necessarily follow. The scope of the bargaining unit is a permissive subject of collective bargaining, and therefore was an unlawful basis for

17

declaring an impasse. *AMF Bowling Co.*, 977 F.2d at 148. By necessity, it follows that Tecnocap engaged in an unlawful employment practice by partially implementing its last and final offer on the basis of the scope of the Operator classifications. *See AMF Bowling Co. v. NLRB*, 63 F.3d 1293, 1299 (4th Cir. 1995) (explaining that an employer "may impose its own terms and conditions of employment unilaterally" after the *lawful* declaration of an impasse).

And, lastly, Tecnocap unlawfully instituted the lockout to force the GMP to negotiate about a permissive topic. Unquestionably, an "employer's use of a lockout *solely in support of a legitimate bargaining position*" does not of itself usually constitute an unfair labor practice. *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 310 (1965) (emphasis added). But such a lockout to support a permissive subject of bargaining violates the NLRA because it seeks to compel acceptance of "a non-mandatory subject as a precondition to reaching an agreement on mandatory subjects." *Greensburg Coca-Cola Bottling Co.*, 40 F.3d at 675 (citing *Am. Ship Bldg. Co.*, 380 U.S. at 308–09; *Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1085 (D.C. Cir. 1991)); *accord Movers & Warehousemen's Ass'n of Metro. Washington, D.C., Inc. v. NLRB*, 550 F.2d 962, 966 (4th Cir. 1977) (holding that because employers cannot insist on bargaining about permissive subjects, they "certainly . . . may not so insist to the point of lockout[,] the ultimate weapon in the labor relations arsenal"). And that is precisely what Tecnocap did here.

* * * *

At bottom, substantial evidence supports the NLRB's decision to adopt the ALJ's determination that it engaged in an unfair labor practice by declaring an impasse over a

18

permissible bargaining subject, partially implementing its last and final offer as to the Operator classifications, and instituting the lockout on this same basis. Therefore, we deny Tecnocap's petition for review and we grant the NLRB's request for an enforcement order as to this part of the NLRB's decision.

B.

We next turn to the Board's conclusion that Tecnocap committed an unfair labor practice based on communications with employees about the impasse and lockout. Tecnocap challenges both the factual determinations and conclusions of law as to each issue, arguing that the evidence shows that Tecnocap communicated accurate and lawful information about the lockout to its employees and that it did not engage in impermissible direct dealing with employees to bypass its obligation to bargain solely with the GMP. We address these matters in turn.

Among other things, section 8(a)(5) of the Act prohibits an employer from "directly dealing" with represented employees. *Overnite Transp. Co. v. NLRB*, 280 F.3d 417, 432 (4th Cir. 2002). The relevant inquiry "is a complex task involving a balancing of the rights of the workers, the union, and the employer." *NLRB v. Pratt & Whitney Air Craft Div., United Techs. Corp.*, 789 F.2d 121, 135 (2d Cir. 1986). On the one hand, an employer is allowed to talk with employees and to communicate its position to them, *id.*, "so long as the communications do not contain a threat of reprisal or force or promise of benefit," *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969); *see also* 29 U.S.C. § 158(c) ("expressing . . . any views, argument, or opinion, or the dissemination thereof, whether in written printed, graphic, or visual form, shall not constitute or be evidence of an unfair

19

labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit"). On the other hand, an employer must not expressly or implicitly "persuade employees to believe that they can achieve their objectives directly through the employer and thus erode the union's position as the exclusive bargaining representative." *Americare Pine Lodging Nursing & Rehab. Ctr. v. NLRB*, 164 F.3d 867, 875 (4th Cir. 1999). That type of conduct crosses the line by "interfer[ing] in the collective bargaining process and in the union's role as the exclusive bargaining representative." Stated differently, direct dealing occurs when there's evidence that the employer decided "'to deal with the [u]nion through the employees, rather than with the employees through the [u]nion.'" *Id.* (quoting *NLRB v. Gen. Elec. Co.*, 418 F.2d 736, 759 (2d Cir. 1969)).

The NLRB adopted the ALJ's conclusion that Tecnocap violated sections 8(a)(1) and (5) by "bypassing the [GMP] and dealing directly with unit employees by soliciting employees to enter into individual employment contracts offering employees employment during a partial lockout on the condition that they abandon their membership in the Union." J.A. 638, 804. To support this conclusion, the ALJ pointed to Tecnocap's three bulletin board notices in the days leading up to the lockout and to the assistance human resources director Darrick Doty provided to the six members who resigned from the GMP and were then rehired as temporary employees. Specifically, the ALJ concluded that the bulletin board notices "created the framework to deal directly with unit employees," "inform[ed] them of the impending lockout," "advis[ed] them that [Human Resources Director Darrick Doty] was 'at [their] disposal to answer any questions,'" and "instruct[ed] them to see Doty if they wished to seek a temporary position during the lockout." J.A. 637, 804 (fourth

20

alternation in original). In addition, the ALJ relied on the fact that Doty drafted the six employees' at-will employment rehiring letters, which it concluded altered their employment rights while still being part of the GMP bargaining unit.

We have reviewed the record and conclude that substantial evidence does not support the conclusion that Tecnocap engaged in impermissible direct dealing. To the extent the notices mentioned the on-going CBA negotiations, they did so in a straightforward manner expressing the company's position without directly or indirectly soliciting employee action. *See, e.g.*, J.A. 281 ("no solution to the contractual negotiation has been found"; "[t]he positions are still far apart and as a result the situation is at impasse"); J.A. 282 ("Both the Company and GMP remain under the obligation to negotiate in good faith."); J.A. 286 ("[T]he Company made its best and final offer to the Union Negotiating Team on March 9, 2018. . . . The [CBA] expired on November 18, 2017 and the extension expired February 28, 2018."). In fact, the notices expressly stated that Tecnocap could *not* communicate with individual members about the negotiations and directed employees to raise those questions with GMP officers. *See* J.A. 282 ("The Company is required to negotiate with the GMP negotiating committee, it cannot engage in individual negotiations with other GMP members. . . . Any questions on this topic [of voting on Tecnocap's best, last, and final offer] should be directed towards your GMP officers.").

This content is the sort that employers are free to provide their union-represented employees without running afoul of the direct dealing prohibition. In short, the notices permissibly relayed "the status of negotiations, outstanding offers, [Tecnocap's] position,

21

the reasons for its position, and objectively supportable, reasonable beliefs concerning future events." *Americare Pine Lodge Nursing & Rehab. Ctr.*, 164 F.3d at 875. And at no point did Tecnocap disparage the GMP or GMP members in the notices when describing its views of the negotiations or the lockout. *See The Gen. Athletic Prods. Co.*, 227 N.L.R.B. 1565, 1575 (1977) (concluding communications constituted direct dealing when they disparaged the union and cast doubt in union members' minds as to the union representative's good faith).

Similarly, the March 7 notice—the longest notice with the most discussion of the potential lockout, staffing during the lockout, and governing labor law—provided matter-of-fact descriptions that were in direct response to employees' questions following the announcement of a potential lockout. Doty testified—without contradiction—that after the initial notice of a potential lockout was posted, current employees approached him to ask if they could continue to work if they resigned from the union. *See* J.A. 26 ("Their question to me was how do they resign from the union. . . . They asked me if they dropped out of the union, could they continue to work."); J.A. 27 ("The employees at that time that were asking me could not afford to not work, so they [were] asking me questions[;] I did not direct them either way what they needed to do."). This testimony confirms the reason provided on the March 7 notice: that it was "for informational purposes given the number of questions that ha[d] been asked about the potential for a lockout." J.A. 282. The notice then clarified that *only* Tecnocap's GMP-member employees would be locked out, not "[m]embers of the IAM, salaried personnel, [or] others." J.A. 282, 286 (same, in March 12 notice). Thus, while the notice responded to inquiries employees had raised as to whether

22

they could continue working during the lockout by stating that Tecnocap was considering

hiring temporary replacement workers, it did not directly or indirectly indicate that anyone

who resigned from the union would be hired as a temporary replacement. To the contrary,

the notice stated that it was "an unfair labor practice for the company to make any promises

of employment to anyone in advance of a lockout that might be affected by that lockout,"

just as the GMP could not lawfully "coerce people to remain union members against their

will." J.A. 282. The notice concluded by observing "[w]hether or not you approve or

disapprove of the representation by the GMP[,] . . . what, if anything, you chose [sic] to do

as a result are matters of your own personal interest and the company cannot tell or advise

as to what you should or should not do." J.A. 282.

Viewed as a whole, the March 7 notice did not cross the line into direct dealing. We

have previously acknowledged the relevance of employees initiating inquiries on particular

topics and an employer's ability to answer such questions so long as it did not seek to

bypass negotiations with the union while doing so:

> An employer who simply answers an employee's question . . . cannot be
> considered to be involved in negotiations for purposes of the Act. If so, then
> an employer would be required to stand by mute—not a practically desirable
> result and certainly not in keeping with [an employer's right to express views
> that "contain[] no threat of reprisal or force or promise of benefit"].

*Americare Pine Lodging Nursing & Rehab. Ctr.*, 164 F.3d at 877. Nothing in the record

contradicts the notice's stated purpose of neutrally answering employee questions. The

record unequivocally establishes that after Tecnocap announced the upcoming lockout,

employees approached Doty to ask if they could continue to work if they voluntarily

dropped out of the GMP, but he "did not direct them either way what they needed to do."

23

J.A. 27. The employees' questions were understandable not just because of the uncertainty of the lockout, but also because of the recent changes to West Virginia's labor laws regarding the right to work.

While relevant to the analysis, the foregoing is not dispositive as the ultimate inquiry remains whether Tecnocap's conduct indicated that it intended to "deal with the [u]nion through the employees, rather than the employees through the [u]nion." *Americare Pine Lodging Nursing & Rehab. Ctr.*, 164 F.3d at 875. Substantial evidence does not support the Board's conclusion that it did. Instead, it reflects that Tecnocap was simply relaying truthful information about its position, the governing law, and how it intended to carry out the lockout. *See id.* at 877. The notice's recitation of the potential hiring of temporary at-will employees did not directly or indirectly promise that it would hire any employees who resigned from the GMP and applied for an at-will position. Instead, it spoke in broad terms of how the lockout would be conducted as Tecnocap continued negotiating with the GMP about the CBA. The notice reiterated that Tecnocap *could not* and *did not* promise at-will employment to any GMP member who resigned from the union. And it recited various terms of the at-will employment, some of which should have dissuaded GMP members from considering that course due to its disadvantages, such as being subject to removal at any time and potentially losing the position once a new CBA was in force "to make room available for a returning GMP member." J.A. 282.

In addition to discussing the terms of any temporary employment, the March 7 notice recited several relevant labor law principles governing both Tecnocap's and the GMP's conduct. For instance, the notice accurately informed employees that Tecnocap and

24

the GMP were obliged to continue negotiating the CBA, that it had to negotiate exclusively with the GMP representatives, and that it could neither "make any promises of employment" to members of the bargaining unit nor "tell or advise [employees] as to what [they] should or should not do." J.A. 282. Certainly—absent contextual clues to the contrary, none of which exist here—we cannot conclude that an accurate statement of labor law principles could, on its own, constitute an unfair labor practice.

The combined effect of the March 7 notice's contents did not "create[] the framework to deal directly with unit employees," but accurately reflected Tecnocap's stance in response to its employees' understandable questions about their employment status going forward. Moreover, there was no "implication that [it] may or may not take action solely on [its] own initiative for reasons unrelated to economic necessities and known only to [it], [such that it] no longer [was] a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion." *Gissel Packing Co.*, 395 U.S. at 618. All told, the ALJ read far too much into the notice's information about hiring temporary at-will employees and failed to credit both the circumstances giving rise to its posting (employee-initiated questions) and the accurate statement of Tecnocap's obligations under federal labor law. Certainly, GMP members were lawfully entitled to consider whether to resign from the GMP and seek a temporary, at-will position during the lockout if they chose to do so. *See* 29 U.S.C. § 157 (guaranteeing workers' rights to decide to participate in collective bargaining or "refrain from any or all of such activities," except to the extent limited by other provisions of the NLRA). Tecnocap continued to negotiate the terms of the bargaining unit's permanent employment under the CBA with the GMP

25

only, as was consistent with its duty under the NLRA. *See NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967) ("[O]nly the union may contract the employee's terms and conditions of employment[.]"). Viewed as a whole, the contents of the March 7 notice do not demonstrate that Tecnocap was attempting to circumvent the GMP in dealing with its employees.

The last finding the ALJ relied on as evidence of direct dealing was the role played by Doty. For instance, the March 5 notice announcing the potential for a lockout stated, "please do not hesitate to get in touch with the HR department for any question you may have." J.A. 281. And the March 12 notice specifically informed employees that the company would "be hiring temporary employees during the lockout. If you wish to apply for a position, please see Darrick Doty." J.A. 286. Lastly, Doty drafted the letters hiring the six former GMP members as temporary employees.

Directing employees to Tecnocap's human resources department to discuss questions concerning their employment or to apply for a position with the company is not dispositive of direct dealing. The ALJ made one too many inferences in concluding that this conduct constituted direct dealing. In other words, what's missing from this record is any evidence that the notices or Doty "said—[]or even implied—that the workers would be better off without the Union," *Pratt & Whitney Air Craft Div.*, 789 F.2d at 135, let alone that they threatened individuals who remained in the GMP or promised a benefit to anyone who resigned. That choice was solely each union members to make, and Doty's assistance in answering employees' questions about their employment or in accepting employment applications did not cross the line into interfering with the GMP members' relationships

26

with the union. Without evidence that the substance of his communications went beyond its permissible scope, merely announcing the availability of human resources personnel to answer employee-initiated questions or accept applications of employment is not cognizable direct dealing. Concluding that conduct such as represented here constitutes direct dealing would not only violate the employer's rights, but also disregard the employees' rights to be informed about their employment and to resign from a union should they independently conclude that course is in their best interest.

* * * *

For these reasons, substantial evidence did not support the ALJ's determination that Tecnocap engaged in direct dealing. We therefore grant the petition for review and deny the NLRB's request to enforce its order adopting the ALJ's findings and conclusions as to direct dealing.

## C.

Lastly, we turn to the two unfair labor practices centered on the lockout Tecnocap instituted. The ALJ concluded—and the NLRB agreed—that Tecnocap violated section 8(a)(1) of the NLRA "by telling employees that [it would] only lockout union members," thereby "discouraging membership in the Union" and "impliedly solicit[ing]" GMP members' "resignations from the Union." J.A. 637, 804. In addition, the ALJ and the Board concluded that Tecnocap violated sections 8(a)(1) and (3) "by locking out unit employees

27

who [were] members of the Union while permitting unit employees who [were] not members of the Union to continue working."[8] J.A. 638, 804.

In its petition to this Court, Tecnocap asserts that the ALJ should not have concluded that its lockout of union members discouraged union membership or that it exhibited antiunion motive by locking out union members and rehiring as temporary replacements the employees who voluntarily resigned from the GMP. We disagree and conclude that substantial evidence supports the ALJ's determination—adopted by the Board—that Tecnocap's decision to lock out only union members while allowing non-union members to be rehired violated sections 8(a)(1) and (3) of the NLRA under the narrow circumstances of this case. Accordingly, we deny the petition for review and grant an enforcement order as to both determinations.

As discussed earlier, sections 8(a)(1) and (3) prohibit employers from engaging in certain antiunion activities when making employment decisions. Both sections are violated when an employer discriminates against union activities in a manner that "may reasonably tend to" discourage union membership. *Alton H. Piester, LLC v. NLRB*, 591 F.3d 332, 336 (4th Cir. 2010); *NLRB v. Brown*, 380 U.S. 278, 286 (1965). Section 8(a)(3) adds the "element of unlawful intent"—something that would also violate section 8(a)(1), but which is not required for that section to be violated. *See Brown*, 380 U.S. at 286; *Medeco Sec. Locks, Inc.*, 142 F.3d at 747. Two Supreme Court decisions decided on the same day in

---

[8] To avoid confusion with the separate section 8(a)(1) violation, this violation will be described as the "section 8(a)(3)" violation even though it involved a violation of both sections.

28

1965 rejected the view that an employer commits a per se violation of sections 8(a)(1) and (3) by locking out union members (*American Ship Building*) or hiring temporary replacement workers during a lawful lockout (*Brown*). While neither case is dispositive, both provide helpful context for considering what these provisions of the Act require.

In *American Ship Building*, the Supreme Court held that instituting a lockout is not a *per se* violation of sections 8(a)(1) and (3). Notably, the question before the Supreme Court was narrow and limited to circumstances where the lockout was otherwise lawful. Its holding was equally confined to an employer's use of "a temporary layoff of employees solely as a means to bring economic pressure to bear in support of the employer's bargaining position, after an impasse has been reached." *Am. Ship Bldg. Co.*, 380 U.S. at 308; *see also id.* at 301–02 (limiting the holding to situations where the employer's sole objective is "to bring economic pressure in support of [its lawful] bargaining position"). Indeed, when undertaking the section 8(a)(1) analysis, the Supreme Court was quick to caution that the circumstances presented did not contain evidence "that the employer used the lockout in the service of designs inimical to the process of collective bargaining" or that the employer was attempting to "frustrate the process of collecting bargaining." *Id.* at 308. And when looking to the employer's motivation for purposes of the section 8(a)(3) violation, the Supreme Court observed that "[t]he purpose and effect of the lockout were only to bring pressure upon the union to modify its demands," and that the case before it contained no evidence "that the employer locked out only union members, or locked out any employee simply because he was a union member; nor is it alleged that the employer conditioned rehiring upon resignation from the union." *Id.* at 312. In sum, *American Ship*

29

*Building* held that implementing a lockout "does not carry with it any necessary implication that the employer acted to discourage union membership or otherwise discriminate against union members as such" and thus did not—without more—violate sections 8(a)(1) or (3). *Id.*

In *American Ship Building*'s companion case, *Brown*, the Supreme Court held that an employer did not exhibit the intent required to violate sections 8(a)(1) and (3) merely by deciding to hire temporary replacements to remain in operation during an otherwise lawful lockout.[9] The narrow question before the Court was whether hiring temporary replacements "carried its own indicia of unlawful intent, thereby establishing, without more, that the conduct constituted an unfair labor practice" in violation of sections 8(a)(1) and (3). *Brown*, 380 U.S. at 282. The decision to hire temporary replacements followed the undeniably lawful decision to implement an employee lockout, meaning that the lockout and hiring was not aimed at avoiding collective bargaining obligations under the Act. *Id.* at 287–88. What's more, the record did not contain any other circumstances indicating the employers desired to discourage union membership or otherwise acted with antiunion animus. *Id.* at 286–90. To the contrary, the sole reason in the record for why the employers hired temporary replacements was "to carry on business," *id.* at 280–81, something the

---

[9] The employment arrangement in *Brown* differs from this case. There, a union instituted a whipsaw strike against one member of a multiemployer bargaining group. The other employer-members then lawfully locked out their employees, but subsequently hired temporary replacements to remain in operation despite the lockout. *Brown*, 380 U.S. at 279–80. In that context, *Brown* examined whether hiring temporary replacements constituted an intrinsic violation of sections 8(a)(1) and (3) of the NLRA.

The Supreme Court has never addressed the lawfulness of hiring temporary replacement workers in the context presented in this case: a single employer and union.

Supreme Court described as "the service of important business ends," *id.* at 287. This narrow context led the Court to conclude that the employers' conduct did not necessarily constitute an unfair labor practice: "In the circumstances of this case, we do not see how the continued operations of respondents and their use of temporary replacements imply hostile motivation any more than the lockout itself; nor do we see how they are inherently more destructive of employee rights." *Id.* at 284.

At bottom, both *American Ship Building* and *Brown* rely on premises that do not exist here: that the employer's conduct—whether in instituting a lockout or hiring temporary replacements—served a solely legitimate bargaining position and a legitimate business interest. *Am. Ship Bldg.*, 380 U.S. at 312 ("[T]his lockout does not fall into that category of cases arising under s[ection] 8(a)(3) in which the Board may truncate its inquiry into employer motivation. . . . [U]se of the lockout does not carry with it any necessary implication that the employer acted to discourage union membership or otherwise discriminate against union members as such."); *Brown*, 380 U.S. at 284. No circumstances leading up to or attendant to the challenged practices would have otherwise suggested discriminatory or antiunion purposes for the employers' conduct.

This case, in contrast, involves employer conduct expressly set to the side in *American Ship Building* and not at issue in *Brown*. Tecnocap decided to lock out only union members in support of an illegitimate bargaining position. By so doing, it engaged in the very conduct the Supreme Court identified in *American Ship Building* as triggering the concerns of sections 8(a)(1) and (3). In concluding no violation of those provisions had occurred in the case before it, the Court distinguished the situation where an employer used

31

a lockout "to avoid its bargaining obligations under the Act," "locked out only union members, or locked out any employee simply because he was a union member," or "conditioned rehiring upon resignation from the union." *Am. Ship Bldg.*, 380 U.S. at 305, 312; *cf. Brown*, 380 U.S. at 283–90. Substantial evidence supports the conclusion reached in this case that Tecnocap implemented the lockout to force the GMP to accept its position on a permissible subject of collective bargaining. The evidence also shows Tecnocap treated union members differently from non-union members by stating—and then acting consistent with those statements—that only union members would be locked out and only non-union members would be considered as temporary replacement workers. Taken as a whole, these facts distinguish this case from *American Ship Building* and *Brown*. Moreover, they permitted the conclusion that Tecnocap violated sections 8(a)(1) and (3).[10]

We have previously recognized that evidence of an employer's motive turns on "subtle things requiring a high degree of introspective perception" best left to the expertise of the NLRB to "reasonably [be] inferred from the nature of the discrimination." *Radio*

---

[10] We are mindful that agency decisions must "stand or fall" upon the agency's reasoning and that we cannot decide the case on a ground "the agency did not consider." *Detroit Newspaper Agency v. NLRB*, 435 F.3d 302, 313 (D.C. Cir. 2006) (Henderson, J., dissenting). This principle is satisfied here because the ALJ held (and the NLRB agreed) that the lockout "would still be unlawful" regardless of the manner in which it was carried out because it was "initiated" for the impermissible purpose of forcing the GMP to accept permissible, rather than mandatory, conditions of bargaining. J.A. 635. Our analysis of the sections 8(a)(1) and (3) violations takes into consideration all of the Board's relevant factual findings and is faithful to *American Ship Building* and *Brown*. As such, we do not depart from the Board's findings as a whole or alter the underlying conclusion that Tecnocap's conduct discouraged union membership and exhibited antiunion motive. But our agreement as to these specific violations rests on the totality of the Board's findings in this case.

*Officers' Union of Commercial Telegraphers Union, AFL v. NLRB*, 347 U.S. 17, 51 (1954).

We will thus "consistently yield to the Board's reasonable interpretations and applications of the Act," and do not engage in a de novo consideration of the record, but instead defer to the Board's conclusion that particular conduct demonstrates antiunion animus "unless the Board exercises the power conferred on it in an arbitrary and unreasonable manner." *Comarco, Inc. v. NLRB*, 40 F.3d 1243 (4th Cir. 1994) (unpublished table decision). Here, we cannot disturb the Board's decision that Tecnocap's course of conduct exhibited the requisite discriminatory and antiunion purpose to constitute a violation of both sections 8(a)(1) and (3). That decision is not inconsistent with Supreme Court case law and is supported by substantial evidence.

Given the evidence that Tecnocap unlawfully declared an impasse and instituted the lockout in the first instance, the Board reasonably viewed Tecnocap's later differential treatment of union and non-union members as evidence that Tecnocap was unlawfully interfering with protected union activity, in violation of section 8(a)(1), and exhibited antiunion animus, in violation of section 8(a)(3).[11] *See, e.g.*, *Teamsters Local Union No.*

---

[11] Even accepting that Tecnocap also desired to remain in operation for economic reasons, we have previously recognized that when the record could support mixed motives for instituting a lockout and hiring temporary replacements, a challenged practice is "nevertheless unlawful if also motivated by an intent to interfere with, and thus injure, a labor organization in the exercise of its" bargaining rights. *Movers & Warehousemen's Ass'n of Metro. Washington, D.C., Inc. v. NLRB*, 550 F.2d 962, 966 (4th Cir. 1977). Here, the record supports the finding of an unlawful motive no matter what additional lawful motives existed. The Board did not address Tecnocap's asserted legitimate business interests in keeping the business in operation, perhaps because those statements addressed why Tecnocap wanted the GMP to concede to its illegitimate bargaining position as to the Operator III classification rather than why it decided to hire temporary workers for the duration of the lockout.

*639*, 924 F.2d at 1085 (granting enforcement of NLRB order concluding employer violated sections 8(a)(1) and (3) by locking out employees "in an attempt to coerce the Union to accept the [employer's]" unfair labor practice because that "does not qualify as a 'legitimate bargaining position' that the employers may pursue through the use of a lockout" under *American Ship Building* or *Brown*); *see also KLB Indus., Inc.*, 357 N.L.R.B. 127, 130 (2011) ("A bargaining lockout is lawful only if its sole purpose is to bring economic pressure to bear in support of a legitimate bargaining position. Where the employer's bargaining position is 'tainted' by unremedied unfair labor practices, however, a lockout in support of that position will be found unlawful, on the ground that employees are effectively forced to accept that unlawful conduct to end the lockout."), *enforced*, 700 F.3d 551 (D.C. Cir. 2012). And this conclusion is appropriate. As the NLRB has previously observed, "a lockout unlawful at its inception retains its initial taint of illegality until it is terminated and the affected employees are made whole." *Movers & Warehousemen's Ass'n of Washington, D.C., Inc.*, 224 N.L.R.B. 356, 357 (1976), *enforced*, 550 F.2d at 962, 966 (observing that the taint persisted throughout the lockout because the employers had done nothing "to dissipate the effects of their unlawful lockout," but had, instead, insisted "even on appeal, that the lockout was lawful from the beginning"). If an employer could not lawfully lockout union employees under the Act, then the Board could reasonably conclude that every means of imposing the resulting unlawful lockout would carry the taint of that impermissible antiunion motive.

Tecnocap's reliance on *NLRB v. Martin A. Gleason, Inc.*, 534 F.2d 466 (2d Cir. 1976), is misplaced given the specific circumstances of this case. There, the Second Circuit

34

held that an employer would not conclusively violate sections 8(a)(1) or (3) simply by locking out union members and then allowing employees to return to work after they voluntarily resigned from the union. *Id.* at 477–78. But because the record did not resolve certain credibility determinations about what employers communicated to their employees, the court remanded the case for those determinations, meaning that its general statements about what the law would allow were not applied to any specific set of facts. *Id.* at 475.

*Martin A. Gleason*'s relevance may be challenged on various grounds, but the most significant aspect for purposes of this case is that the Second Circuit opined on the potential lawfulness of rehiring employees who voluntarily resigned from the union as temporary replacements based on the premise that the employer's lockout was lawful. *Id.* at 471–72 ("The issue in the present case is whether an employer *who has lawfully locked out its employees* can, without violating s[ections] 8(a)(1) and (3), take the position that it will not, during the lockout, allow a striking employee to return to work unless he has resigned from the union, even though the employer at no time asked, or in any way urged, that the union member resign from the union or return to work." (emphasis added)); *see also id.* at 475 ("We hold, therefore, that the lockout was lawful."). Only after making this threshold determination of an initial lawful lockout did the court conclude that an employer may be able to discuss the possibility of rehiring employees who resigned from the union without violating sections 8(a)(1) and (3). *See id.* at 478 ("Proceeding on the basis of this court's holding that the lockout was in all respects lawful, none of these possible elements of what may have been an unfair labor practice can be found to be a violation [of sections 8(a)(1) and (3)] if it is concluded that [the employers] did not induce the resignations from the

35

Union by any of their employees."). As discussed earlier, that is a very different lens by which to consider whether an employer's subsequent conduct unlawfully discourages union activity or contained an antiunion purpose. For this reason, we need not address the persuasiveness of the Second Circuit's understanding of sections 8(a)(1) and (3); it simply does not apply to the circumstances presented in this case and therefore does not aid Tecnocap.

For the reasons provided, we deny review and grant enforcement of the NLRB's order concluding that Tecnocap violated sections 8(a)(1) and 8(a)(3) based on it conducting a lockout of union members that discouraged union activity. Our decision to deny review and order enforcement is limited to our application of the deferential standard of review to the Board's determinations about the specific facts before it. Most notably, this case does not call for us to consider any broader issue such as whether it per se violates sections 8(a)(1) or (3) to lock out union members while allowing non-union employees performing the same work to remain employed, or to rehire individuals who resign from a union while locking out union members.

IV.

For the reasons provided, we deny the petition for review and grant the cross-petition for enforcement as to the partial implementation of the last, best and final offer without reaching a good faith impasse and locking out Union members in support of a

36

demand that was a permissive subject of bargaining. J.A. 792, Amended Conclusions of Law 5(1) and (3). We grant the petition for review and deny the cross-petition for enforcement as to direct dealing. J.A. 792, Amended Conclusion of Law 5(2). And we deny the petition for review and grant the cross-petition for enforcement as to Tecnocap's discouragement of union membership in how it undertook the lockout. J.A. 804, Conclusions of Law 3 and 4; *see* 792 (adopting these conclusions without alteration). We remand the case to the NLRB for it to determine the effect our limited grounds for enforcing its order has on the remedies it ordered and for entry of a remedial order that is consistent with our decision. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this Court and argument would not aid the decisional process.

*PETITION FOR REVIEW GRANTED IN PART AND DENIED IN PART, CROSS-APPLICATION FOR ENFORCEMENT GRANTED IN PART AND DENIED IN PART, AND REMANDED*